**SIGNED this 25th day of April, 2017**

_____
Shelley D. Rucker
UNITED STATES BANKRUPTCY JUDGE

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF TENNESSEE
# SOUTHERN DIVISION

In re:

William Harry Fryar,                              No. 1:16-bk-13559-SDR
       Debtor                              Chapter 11

## MEMORANDUM[1]

The Debtor filed a Notice of Proposed Use, Sale or Lease of Property Outside of the Normal Couse of Business combined with a Motion to Sell Property Free and Clear and Motion for Settlement and Compromise on February 24, 2017. The property to be sold was the Debtor's stock interests in two corporations whose value the Debtor listed as $900,000 on Schedule A/B, Question 19. The buyer of these interests is the other shareholder of the companies. The purchase price for these interests is $350,000 plus the conveyance by one of the companies of a

---

[1] The court delivered this opinion orally on April 13, 2017. Due to its applicability to settlements proposed in a Chapter 11 case after the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the court is filing a written opinion. Modifications and edits for citation, style and grammar have been made to enhance readability. To the extent that this memorandum differs from the opinion read in court, this memorandum shall control.

1

piece of property which it owns. The interests are to be sold free and clear of the tax lien filed by the Internal Revenue Service and any other claim or interest. However, the settlement does not propose for the IRS lien to attach to the proceeds of the sale. Rather the lien will attach to two other properties which the Debtor owns individually on Highway 58, Chattanooga, Tennessee, and the property being conveyed to the Debtor in the settlement.  Those Highway 58 properties are currently encumbered by a $531,000 mortgage in favor of Pinnacle Bank, the successor in interest to Cornerstone Bank. The settlement piece of the motion requires Pinnacle's lien to be satisfied by the payment to Pinnacle of the $350,000 in sales proceeds. This would be less controversial if Pinnacle's collateral were worth $350,000, but the Debtor contends that the property is worth only $200,000. The U.S. Trustee and creditors Sammie and Robert Gammenthaler, BBCO, LLC, and SmartBank appeared in opposition to the motion. The Gammenthalers, BBCO and SmartBank have filed unsecured claims totaling $436,000 (after deducting the secured portion of SmartBank's claim). The basis of their objections is that Pinnacle is being preferred and the priorities set for distribution under the bankruptcy code are being reordered to Pinnacle's benefit.  As such, the court should not find the settlement to be fair and equitable.

     The parties made oral arguments regarding the appropriateness of the settlement at the hearing but put on no evidence. Following the hearing, the parties filed Stipulations of Fact on which the court will rely for making its findings. (Doc. No. 73.)  Those stipulations were supplemented with testimony from the Debtor at the hearing on April 13th before the court issued its opinion.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (N). These are the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 as made applicable to contested matters by Fed. R. Bankr. P. 9014.

**A. Findings of Facts**

The Debtor owns a 50% interest in two businesses: WLF Properties, Inc. and LF Properties, Inc. Stephen Long owns the other 50% of both businesses.

WLF owns a storage operation in Oak Ridge, Tennessee, and four rental houses in Murfreesboro, Tennessee. The storage operation has a value of approximately $2.4 million, and the rental houses have a value of approximately $325,000. WLF has debts of approximately $1.8 million. Based on these stipulations, the court calculates the Debtor's 50% interest to be worth approximately $467,500.

LF owns property located at Belgrade Road, Oak Ridge, Tennessee, and 219 Yearwood Avenue, Murfreesboro, Tennessee. Those properties are worth approximately $265,000. LF has debts of $220,000. Based on these stipulations, the court calculates that the Debtor's equity in LF is worth approximately $22,500.

The value of the Debtor's interest in the two businesses, after debt, is approximately $490,000.

In addition to these business interests, the Debtor individually owns properties at 6308 and 6310 Highway 58, Harrison, Tennessee. In his schedules, the Debtor valued these properties at $100,000 each. The Debtor owes Hamilton County and the City of Chattanooga property taxes on the Highway 58 properties totaling approximately $48,000 based on proofs of claim nos. 5-9 & 14-17. Pinnacle Bank has a mortgage of approximately $531,000 on these two

properties based on the documents filed with claim 3. Its deeds of trust were recorded on October 20 and 31, 2008.

The IRS has a claim of approximately $90,000 based on proof of claim no. 4. Approximately $74,000 of this claim was asserted as secured. Notice of the federal tax lien was filed on July 5, 2016. An additional approximately $15,000 of the claim is asserted as priority. The priority of the liens on 6308 and 6310 Highway 58 appears to be: first, the property taxes owed to the City and County, then the mortgage to Pinnacle Bank, and finally the IRS lien to the extent that its claim is not satisfied by other property of the Debtor.

WLF owes Pinnacle Bank $1.1 million, secured by the storage operation and the rental houses owned by WLF. This debt was guaranteed by the Debtor and Mr. Long. Pinnacle Bank has assigned the debt to Mr. Long's company, S.J. Long, Inc. which is now the holder of that debt.

Excluding the claims of Pinnacle Bank and S.J. Long, Inc., there is approximately $700,000 of unsecured debt reflected in the claims filed in this case. No objection to any of these claims had been filed at the time of the hearing on the settlement.

As noted above, the settlement involves a series of transactions that breaks down as follows:

1. Mr. Long will pay $350,000 into the estate. In exchange, the estate will convey all stock interests of the Debtor in WLF Properties and LF Properties to Mr. Long. This is all subject to Mr. Long's obtaining financing from Pinnacle Bank for $350,000.

2. LF Properties will convey one of its properties, 219 Yearwood Ave., to the estate free and clear of liens. Debtor estimates the value of that property to be $150,000. The stipulations state that the property was purchased for $166,000 in 2004 and that the tax appraisal made by

4

Rutherford County, Tennessee is $124,800. The Debtor testified that the property is regularly rented and believes that the property will provide value of that amount, although the Debtor also stated that there are repairs he would like to make to the property.

    3. Mr. Long, WLF Properties, and LF Properties will release the Debtor from all claims they may have against him. At the hearing, Mr. Long's counsel clarified that there were debts that WLF Properties and LF Properties have asserted against the Debtor individually. Counsel for the Debtor agreed that these were amounts owed by the Debtor.[2]

    The settlement also provides that the Debtor will release Mr. Long, WLF Properties, and LF Properties from all claims he may have against them. No claims or causes of action were listed in Schedule B filed by the Debtor. (Schedule A/B, Questions 33-34.)

    4. S.J. Long, Inc. will release the Debtor's guaranty on the obligation from the debt it purchased from Pinnacle Bank.

    5. The estate will pay the sale proceeds of $350,000 to Pinnacle Bank on the $531,000 obligation. Pinnacle Bank will release the mortgage on 6308 and 6310 Highway 58, but will retain a claim for $181,000 for the deficiency which it will subordinate to the other unsecured creditors.

    Pinnacle Bank acknowledges that if the $350,000 were paid to the estate, that the IRS lien on the stock and the IRS priority lien would be paid before its unsecured claim. It also acknowledges that if it were to foreclose on the two Highway 58 properties that the tax liens of

---

[2] The stipulations do not indicate what types of claims are being settled. None of these parties have filed proofs of claim, so the court is relying on the stipulations made in court that these claims exist and are being released. Only Mr. Long was listed as a creditor in the Debtor's schedules. To the extent that Mr. Long and the Debtor are both guarantors of the debt of WLF to S.J. Long, Inc., there might be contribution claims but the parties' stipulations lead the court to believe that the WLF obligation is fully secured.

the City and County would have to be paid, and that it is likely to only receive $140,000 from the sale of its collateral.[3]

Creditors BBCO, LLC (Claim no. 23 for $57,191), Robert Gammenthaler (Claim no. 22 for $34,360) and Smartbank (Claim no. 24 for $381,843 of which $37,100 is claimed as secured) have objected to the settlement.

The Debtor testified that he will reduce the claims through objections to filed claims and liquidation from other sources to $100,000. The unsecured claim for his school loans will stay in deferment because he intends to return to school to complete his doctorate degree.

### B. Legal Analysis

The court can authorize the sale of assets when there is a sound business purpose for such action. *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). The stipulations do not specifically state the business purpose of the sale. However, in oral argument, the Debtor argued that this settlement resolves the issues between the two shareholders and provides a means for WLF to continue and avoid a foreclosure which would subject both shareholders to significant individual tax liability.

The Debtor testified at a hearing on a motion to dismiss, brought by Pinnacle Bank early in the case, that his relationship with Mr. Long had deteriorated and that he was not getting information from Mr. Long nor any income from the properties. At the initial hearing on this motion, the court asked the parties if this settlement was to facilitate a business divorce between two business associates. The parties acknowledged that this was the case. Given that situation, the Debtor faced either buying out his partner or selling to him to resolve these disputes. The

---

[3] The court calculates that rather than leaving it with a $391,000 deficiency claim, the current settlement proposal leaves it with only a $181,000 deficiency claim on which it will not receive any other funds until the other creditors have been paid.

court finds that the resolution of the claims arising from the two companies, the avoidance of the tax liability, and realization of value for the creditors from the stock interest provide a sufficient business purpose for the sale. However, because the business terms of the sale also involve a settlement and a payment of one unsecured creditor ahead of other prior parties and other unsecured creditors, the court must also review the standards for approval of a settlement.

The involvement of the court in the approval of a settlement is based on Fed. R. Bankr. P. 9019(a) which provides that a court may approve a compromise or settlement on motion by the trustee after notice and a hearing. Notice is required to be given to creditors, the U.S. Trustee, the debtor, and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct. Fed. R. Bankr. P. 9019.

> In bankruptcy proceedings, as distinguished from ordinary civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable. *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re A & C Properties,* 784 F.2d 1377, 1381 (9th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). In considering a proposed compromise, the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable. *In re American Reserve Corp.,* 841 F.2d 159, 162-63 (7th Cir.1987). The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is "reasonable." *Id.* at 162.
> The need for this safeguard is obvious. Any settlement between the debtor and one of his individual creditors necessarily affects the rights of other creditors by reducing the assets of the estate available to satisfy other creditors' claims.

*Reynolds v. C.I.R.,* 861 F.2d 469, 473 (6th Cir. 1988); *see also In re Anderson*, 377 B.R. 865, 871 (B.A.P. 6th 2007) (abrogated on other grounds) (discussing unpublished opinions by Sixth Circuit and the 6th Cir. B.A.P. adhering to the "fair and equitable standard" for settlement approval).

To determine whether a compromise is fair and equitable, the court considers factors such as the probability of success on the merits, the complexity and expense of litigation, and the

7

reasonable views of creditors. *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988). The debtor has the burden of persuading the court that the compromise is in the estate's best interest. *McGraw v. Yelverton (In re Bell & Beckwith)*, 87 B.R. 476, 478 (N.D. Ohio 1988).

The stipulations are short on exactly what is being compromised. At the hearing, the Debtor was able to clarify that it is a compromise of what he owes Pinnacle and what he owes WLF and LF and a compromise of the value of the stock interest being sold. The stipulations still do not clearly answer the question of why all of the cash should be paid to Pinnacle other than that Pinnacle is requiring it to be done that way. They do not offer facts from which the court could determine how this helps the Debtor move forward with a plan or how that plan will ultimately leave the Code's distribution priorities intact.

The issue of reordering the distribution priorities in a settlement has been the subject of controversy. The Fifth Circuit held that it would not approve a settlement that disregarded the priority system required by the Code in sections 726 and 1129. *U.S. v. Aweco, Inc*. 725 F.2d 293, 298 (5th Cir. 1984) ("[A] bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors.").

The Second Circuit found that standard to be "too rigid a test." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2nd Cir. 2007). It opted for a more flexible test where the facts of the case indicated that approval of a settlement reordering distribution from some assets was necessary to allow the estate to pursue its most significant assets and where the nature and extent of the estate and the priorities were not fully resolved. *Id.*

Nevertheless, it recognized that a more flexible rule created a greater risk that the parties to a settlement might engage in improper collusion. "Thus whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019." *Id.* "The court must be certain that parties to a settlement have not employed a settlement as a means to avoid the priority strictures of the Bankruptcy Code." *Id.*

The United States Supreme Court recently accepted certiorari on this issue, but opined on a more specific question involving the approval of a structured dismissal which did not follow the Code's priority distribution. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017). The Supreme Court held that bankruptcy courts may not approve structured dismissals that provide for distributions that do not follow ordinary priority rules without the consent of affected creditors. *Id.* at 983.

In dicta, the Supreme Court acknowledged that there are instances where interim distributions that violate the ordinary priority rules have been approved.

> We recognize that *Iridium* is not the only case in which a court has approved interim distributions that violate ordinary priority rules. But in such instances one can generally find significant Code-related objectives that the priority-violating distributions serve. Courts, for example, have approved "first-day" wage orders that allow payment of employees' prepetition wages, "critical vendor" orders that allow payment of essential suppliers' prepetition invoices, and "roll-ups" that allow lenders who continue financing the debtor to be paid first on their prepetition claims. *See Cybergenics*, 330 F. 3d, at 574, n. 8; D. Baird, Elements of Bankruptcy 232-234 (6th ed. 2014); Roe, 99 Va. L. Rev., at 1250-1264. In doing so, these courts have usually found that the distributions at issue would "enable a successful reorganization and make even the disfavored creditors better off." *In re Kmart Corp.*, 359 F. 3d 866, 872 (CA7 2004) (discussing the justifications for critical-vendor orders); see also *Toibb* v. *Radloff*, 501 U.S. 157, 163-164, 111 S. Ct. 2197, 115 L. Ed. 2d 145 (1991) (recognizing "permitting business debtors to reorganize and restructure their debts in order to revive the debtors' businesses" and "maximizing the value of the bankruptcy estate" as purposes of the Code).

*Id.*

9

The court now turns to the settlement before it. It finds that the settlement does in fact provide for a distribution that does not follow the ordinary priority rules. Based on the filed claims which are deemed allowed until objected to under 11 U.S.C. § 502(a), the proceeds from the sale of the stock should go first to the lien of the IRS. 26 U.S.C. §§ 6321, 6323(a). Then the proceeds would be paid into the estate for distribution to priority creditors and then to unsecured creditors on a pro rata basis. The amount of claims might be reduced and liens might be avoided or further negotiated, but, as the claims currently stand, Pinnacle Bank is moving to the head of the line.

This might be acceptable if all of the creditors were consenting; however, three creditors and the U.S. Trustee have objected, so the court must consider whether there are Code-related objectives being served that are so significant that deviation is justified.

This settlement is not part of a "first day" order to ensure the Debtor's survival to get to a plan. This case has been here for eight months and was filed on the heels of prior chapter 11 which was dismissed for failure to propose a plan. At the initial hearing on the motion, the court asked counsel whether there were other properties which would provide an income stream to fund a plan and pay unsecured creditors, but the Debtor and the U.S. Trustee both contended there was very little income in the case and that funding would have to come from the liquidation of assets. The court is hard pressed to determine what business remains to be revived or reorganized.  This is an individual chapter 11 in which the Debtor sought settlement approval on the basis that he believes he can provide the same 53% dividend to all unsecured creditors. Under the law in the Sixth Circuit, an individual may not retain anything in a chapter 11 unless each class of creditors consent or are paid 100%. *Ice House Am., LLC v. Cardin*, 751 F.3d 734,

739 (6th Cir. 2014). The Debtor has not provided any proof that the objecting creditors would support a plan if they were paid 53%.

The court's review of the facts in this case leads it to conclude that this settlement is more of a preamble to a conversion or structured dismissal than it is to the situation in *Iridium*, where there was a reorganization anticipated. The Debtor has failed to prove that disregard of the priority scheme will promote "a significant Code-related objective." *Jevic*, 137 S. Ct. at 985. As with the situation in *Jevic*, this case more closely resembles the proposed transactions that lower courts have refused to allow on the ground that they circumvent the Code's procedural safeguards. *Id.* at 986.

The court does not refuse to authorize the compromise lightly. The court realizes that the parties found themselves caught at a time when the settlement standards may have changed based on the *Jevic* case. The court understands the Debtor's desire to find a way to retain the two properties on Highway 58, one of which is where the Debtor originally testified he lives and leases a business location to a family member for the operation of his business. The court also understands that the Debtor wants to ensure that there will be no new tax liability arising from a foreclosure of WLF's holdings. Failing to approve this settlement may result in the unsecured creditors getting nothing, but that is their decision to make if they want to see if they can find a better deal for the Debtor's stock interests. The fact that this settlement disregards the priority scheme contained in the bankruptcy code entitles them to ask the court for close scrutiny of the proposed compromise and the prospects for reorganization.

In light of the Supreme Court's recent ruling in *Jevic,* parties who seek approval of settlements that provide for a distribution in a manner contrary to the Code's priority scheme should be prepared to prove that the settlement is not only "fair and equitable" based on the

11

factors to be considered by the Sixth Circuit, *Bauer*, 859 F.2d at 441, but also that any deviation from the priority scheme for a portion of the assets is justified because it serves a significant Code-related objective. The proposed settlement should state that objective, such as enabling a successful reorganization or permitting a business debtor to reorganize and restructure its debt in order to revive the business and maximize the value of the estate. The proposed settlement should state how it furthers that objective and should demonstrate that it makes even the disfavored creditors better off.

The proposed settlement in this case fails to meet this standard. To approve a settlement which is a *sub rosa* plan or a precursor for a conversion or dismissal in which the Code's priority scheme is ignored would be an abuse of the bankruptcy court's discretion.

For these reasons, the Debtor's motion to compromise is denied. Without the compromise the buyer is unwilling to go forward with the sale, therefore the motion to sell is denied as moot.

A separate order has been entered at docket number 79.